UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FELIZ ORELVIS,

                           Plaintiff,          DECISION AND ORDER
                                                           05-CV-6498 CJS
vs.

THE STATE OF NEW YORK DEPARTMENT
OF CORRECTIONAL SERVICES, et al.,

                           Defendants.
_____

APPEARANCES

For plaintiff:                Feliz Orelvis, *pro se*
                                 97-A-6178
                                 Auburn Correctional Facility
                                 Box 618
                                 Auburn, New York 13021

For defendants:           Maritza C. Buitrago, Esq.
                                 Office of New York State Attorney General
                                 144 Exchange Blvd., Suite 200
                                 Rochester, New York 14614

INTRODUCTION

Feliz Orelvis ("Plaintiff"), a prison inmate currently confined at Gowanda Correctional Facility, proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983, claiming that defendants violated his constitutional rights. Now before the Court is Defendants' motion for summary judgment (Docket No. [#38]). For the reasons that follow, Defendants' application is granted and this action is dismissed.

1

FACTUAL BACKGROUND

For purposes of this Decision and Order, the following are the facts viewed in the light most-favorable to Plaintiff. On March 7, 2005, Plaintiff was in the custody of the New York State Department of Correctional Services ("DOCS") and housed at Livingston Correctional Facility ("Livingston"). Plaintiff and another inmate, Gregory Peguero ("Peguero") were in the Day-room of the D-1 Dorm. Defendant Corrections Officer David Stickel ("Stickel") was sitting at a desk, reading a book, in an office outside of the day room. (Plaintiff's Deposition at 30). There was a glass window between the Day-room and the office. Plaintiff had never had any problems or confrontations with Peguero prior to that day. *Id*. at 28. Plaintiff returned a wet floor mop to a slop sink in which Peguero was washing dishes, and Plaintiff accidentally touched either Peguero or Peguero's dishes with the mop. The two inmates began arguing, and Peguero assaulted Plaintiff with the mop handle, causing a cut to Plaintiff's face and a scratch to Plaintiff's chest. The cut on Plaintiff's face was approximately one inch long.[1] The injury to Plaintiff's chest consisted of "red marks including scratches." (Inmate Grievance dated June 12, 2005, ¶ 7(B)).

Stickel told Plaintiff and Peguero to stop fighting, and they complied. At a subsequent disciplinary hearing, Plaintiff testified that Stickel responded immediately to stop the assault by Peguero. For example, Plaintiff testified that Stickel "immediately stopped" the fight between Plaintiff and Peguero. (Flagler Affidavit, Exhibit B, March 15, 2005 Disciplinary Hearing transcript at 3-4). Plaintiff further testified:

---

[1] Exhibit to Complaint (Docket No. [#1]), Plaintiff's Inmate Grievance, LKV 5249-05, ¶ 7(c)).

2

> [Hearing Officer]: [Peguero] just attacked you for no reason?
>
> [Plaintiff]: . . . So I lifted up the mop and I tried to take it off from the mop handle, so when I take 'em off, I tried to hang the mop handle on the, on the wall, and the, the dirty mop bucket touched one of his [Peguero's] dishes. So I apologized to him but he got so crazy, and pushed me, when [I was] holding the mop handle in my hand, so the mop handle hit him in the chest and then when he walked by he jumped on me, grabbed the mop handle started swinging on me. . . . So when he was swinging on me, I had some boys right behind me, I turned around, look at the Officer Stickel, coming through the door, saying something. . . . I turned and looked, I threw the mop handle and hit inmate [Peguero] right in the chest. Pow. So when I hear that I walk right back and drop the mop. So he [Stickel] got in there, they take me to the front porch.

(Docket #17-3 at 7-8). Similarly, Stickel testified at the disciplinary hearing that he "immediately responded" once he became aware of the fight. (March 15, 2005 hearing transcript at 8). At his deposition taken as part of this action, Plaintiff testified that prior to the assault, he began arguing loudly with Peguero, in order to attract Stickel's attention. (Plaintiff's Deposition at 24). Plaintiff further testified that from the office, Stickel was in a position to see Peguero with the mop handle. However, Plaintiff opined that Stickel waited to intervene until after Peguero hit Plaintiff with the mop. *Id*. at 24-32. Following the incident, Plaintiff informed corrections staff that he did not need protection from Peguero. *Id*. at 41.

After Stickel separated Plaintiff and Peguero, other Corrections Officers arrived, two of which escorted Plaintiff to the "front porch" of the dormitory, where one officer pat-frisked Plaintiff. As discussed further below, approximately thirty minutes later, Corrections Officers discovered an improvised knife, made from a utility-knife blade ("the knife"), in the porch area near where Plaintiff had been standing. (Docket # 17-3 at 17). After pat-frisking Plaintiff, Corrections Officers took Plaintiff to the facility Property

3

Room, where they strip-searched him and found no weapons. The officers then escorted Plaintiff to the infirmary. (Docket # 17-3 at 10).

At the infirmary, Plaintiff was examined by defendant Dr. Benjamin Agustin, M.D. ("Agustin"). Agustin initially told Plaintiff that the facial wound would require stitches. After Plaintiff's wounds were cleaned by a nurse, Agustin decided not to apply stitches to Plaintiff's face. An injury report completed by a nurse Kathy Rynders ("Rynders") described the facial wound as a "1¼" long surface laceration." (Rynders Affidavit [#42] Exhibit A). Agustin provided Plaintiff Ibuprofen for pain. However, Plaintiff contends that he experienced "severe pain" during the night, and that the following morning, his facial wound had become stuck to his bed sheet.

Following the assault, Stickel issued Plaintiff a misbehavior report, charging Plaintiff with fighting and violent conduct in connection with the incident with Peguero. Defendant Corrections Lieutenant Rusty Simon ("Simon"), in his capacity as "Review Officer" pursuant to 7 NYCRR § 251-2.2, reviewed the misbehavior report and designated the charged offenses as Tier III infractions, the most serious type. Defendant Corrections Captain Bruce Flagler ("Flagler") conducted a Tier III disciplinary hearing. (Flagler Affidavit, Exhibit C, Hearing Transcript). During the hearing, Plaintiff asked to call only one witness, Stickel. Flagler permitted Plaintiff to call Stickel as a witness, and to question Stickel. In that regard, Plaintiff told Flagler the questions that he wanted to ask Stickel, and Flagler asked the questions. Several times during the hearing, Flagler refused the ask a question posed by Plaintiff, because it pertained to issues that were not relevant to the hearing. For example, Plaintiff repeatedly sought to ask Stickel questions pertaining to Plaintiff's alleged possession of the knife, which was

4

not at issue in the hearing. Apart from his own testimony and Stickel's testimony, Plaintiff declined to present any additional evidence. *Id*. at 6, 18. At the conclusion of the hearing, Flagler found Plaintiff guilty of fighting and violent conduct, and sentenced him to sixty days in the Special Housing Unit ("SHU"). As to his decision, Flagler stated that, even though Stickel had not observed Plaintiff doing anything violent, the various reports and testimony, as well as the injuries to both Plaintiff and Peguero, indicated that Plaintiff and Peguero had been fighting before Stickel observed them. (*Id*. at 18). The sixty-day SHU sentence was designated to run from March 7, 2005 through May 6, 2005. (Dubray Affidavit ¶ 6).

On or about March 10, 2005, Corrections Officer Green ("Green"), who is not a party to this action, issued Plaintiff a second misbehavior report, accusing him of possessing the knife on March 7, 2005. On March 25, 2005[2], defendant Deputy Superintendent G. Saj ("Saj") conducted a Tier III disciplinary hearing. Saj permitted Plaintiff to testify, to call witnesses, and to ask questions of the witnesses. (Saj Affidavit, Exhibit C). Green testified at the hearing that he discovered the knife near where Plaintiff had been standing. Corrections Sergeant Putney, who is not a defendant in this action, testified that during his investigation of the assault by Peguero, Peguero told him that after Peguero and Plaintiff argued at the slop sink, Plaintiff displayed the knife to Peguero in the dorm bathroom, and that Peguero grabbed the mop handle as a defensive weapon. (Docket # 17-3 at 37). Putney stated that the knife was found

---

[2] The hearing transcript indicates both that the hearing occurred on March 17, 2005 and March 25, 2005, although the subsequent appeal documents refer to the hearing date as being March 25, 2005. (Docket #17-3 at 3).

5

"within a few feet of where [Plaintiff] had been taken outside to wait" following the fight. *Id*. Putney further stated that, based on his investigation, Plaintiff had "five or ten seconds . . . that nobody could account for him" while on the porch, during which time he could have dropped the knife. *Id*. at 40. Saj also permitted Plaintiff to question Tony Baria ("Baria"), a fellow inmate who testified, contrary to what Peguero told Putney, that he did not see Plaintiff with the knife. Based on such evidence, Saj found Plaintiff guilty of possessing the knife, and imposed a sentence of six months in the SHU, with thirty days loss of good time. *Id*. at 67-68. Plaintiff's sentence, which was to be served consecutively to his prior sixty-day SHU sentence, was scheduled to begin on May 6, 2005 and end on November 6, 2005.

Plaintiff was transferred to the SHU at Lakeview Shock Correctional Facility ("Lakeview") to serve his SHU sentences. Plaintiff appealed both of his disciplinary convictions. On June 3, 2005, the DOCS Commissioner affirmed the conviction and sentence for the weapon charge, but reversed the convictions for fighting and violent-conduct. By June 3, 2005, Plaintiff had already served the sixty-day sentence for the reversed conviction. However, as a result of the reversal, DOCS recalculated Plaintiff's March 25, 2005 sentence, to begin on March 25th, rather than May 6th, and to end on September 25th, rather than November 6th. In so calculating the sentence, DOCS opted not to credit Plaintiff for the time that he spent in SHU between March 7th and March 25th, treating such time as pre-hearing administrative segregation. As a result of such re-calculation, Defendants maintain that Plaintiff actually served no SHU time in

6

connection with the reversed conviction.[3]

Plaintiff subsequently filed inmate grievances, complaining that his inmate records had not been corrected to reflect the reversal of his conviction, and that he should be released from the SHU. The grievances were granted to the extent that Plaintiff's records were corrected, however, they were denied to the extent that Plaintiff was seeking to get out of SHU. As to the latter, the Inmate Grievance Review Committee advised Plaintiff to "contact the disciplinary office with regard to his remaining time in SHU." Plaintiff appealed such determination, and the Central Office Review Committee ("CORC") eventually affirmed the partial-denial of the grievance. Notably, the CORC's decision appears to have been signed by "K. Bellamy." (CORC Decision dated Augst 3, 2005).

Plaintiff subsequently wrote letters to defendant Captain Sandra Amoia ("Amoia"), a member of DOCS' Disciplinary Review Committee, and Lieutenant R. Zimpfer ("Zimpfer"), Supervisor of the Disciplinary Office of the Lakeview SHU, asking that he be released from SHU, and that he receive credit for the SHU time that he served before his conviction was reversed. Amoia, and Zimpfer did not respond to Plaintiff's letters. Nonetheless, Lakeview's Disciplinary Review Committee eventually reduced Plaintiff's SHU sentence by one month and 24 days, for good behavior.

---

[3]Defendants contend that as a result of the recalculation, Plaintiff actually served nothing of the sixty-day sentence. (Dubray Affidavit at ¶ ¶ 10-12). On that point, Defendants state that "there is no requirement that a hearing officer credit an inmate for time served [in SHU] prior to the completion of the hearing." *Id*. at ¶ 11. As discussed further below, Defendants are correct that inmates have no right under New York law to receive credit for pre-hearing time served. Moreover, taking the reversed March 15, 2005 hearing out of the picture, the time between the incident date, March 7, 2005, and the completion of the weapon possession hearing, on March 25, 2005, can properly be viewed as pre-hearing administrative confinement.

7

(Dubray Affidavit at ¶ 14). Consequently, Plaintiff's SHU sentence ended on July 31, 2005. *Id*. at ¶ 16.[4] The period between the March 25th conviction and July 31, 2005 was four months and six days. *Id*. at ¶ 15. Plaintiff's total time in the SHU was eighteen days for pre-hearing administrative segregation, four months and six days for his disciplinary sentence, and eleven days waiting for a transfer out of Lakeview.

On September 26, 2005, Plaintiff commenced the subject action. Plaintiff subsequently amended his Complaint. Plaintiff alleged that Stickel violated his Eighth Amendment rights by failing to protect him from being assaulted by Peguero, and that Stickel also wrote a false misbehavior report, accusing Plaintiff of fighting and violent conduct. Plaintiff alleged that Simon violated his constitutional rights by "incorrectly and intentionally approv[ing] the misbehavior report as a valid report, even though said report lack[ed] in specific the necessary roles played by the Plaintiff during the incident." (Complaint ¶ 25). Plaintiff alleged that Agustin violated his Eighth Amendment rights by acting with deliberate indifference to Plaintiff's serious medical needs, namely, by failing to stitch the cut on Plaintiff's face. (Complaint ¶ ¶ 20-22). Plaintiff alleged that Flagler violated his constitutional rights at the disciplinary hearing, by acting with partiality and by depri[ving] Plaintiff of his Constitutional Rights to reply to the evidence used against him." (Complaint ¶ 29). Similarly, Plaintiff alleged that Saj violated his constitutional rights at the second disciplinary hearing by acting in a biased and partial manner. Plaintiff alleged that Zimpfer and Amoia violated his constitutional rights by failing to

---

[4]Plaintiff was not actually transferred out of the SHU until eleven days later. (Plaintiff's Statement of Facts [#49-2] at ¶ 54). However, that eleven-day period, during which Plaintiff was double-bunked, was due to an administrative delay in arranging Plaintiff's transfer, and was not part of a disciplinary sentence. (Dubray Affidavit ¶ ¶ 16-17).

respond to his requests to be released from the SHU following the reversal of his convictions for fighting and violent conduct, and by failing to properly recalculate his sentence. (Complaint ¶ ¶ 32-34). Finally, Plaintiff alleged that defendant Thomas Eagen ("Eagen"), Director of DOCS' Inmate Grievance Program, violated his constitutional rights by denying his grievance. (Plaintiff's Deposition at 80).

Following pretrial discovery, Defendants filed the subject summary judgment motion.

## STANDARDS OF LAW

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). Moreover, since Plaintiff is proceeding *pro se*, the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).[5]

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal

---

[5]Plaintiff was served with the notice required by *Irby v. New York City Transit Auth.*, 262 F.3d 412 (2d Cir. 2001). (Docket No. [#55]).

right. See, *e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977).

\*\*\*

An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122, 127 (2d Cir. 2004).

<u>*Failure to Protect From Assault By Another Inmate*</u>

Stickel contends that he is entitled to summary judgment on Plaintiff's "failure to protect" claim. The legal principles applicable to such a claim are clear:

[I]t is settled that, under the Eighth Amendment, "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir.1988)) (internal quotation marks omitted). In *Farmer*, the Supreme Court set out the two-pronged test that determines when a failure to protect a prison inmate from assault by other inmates rises to the level of a constitutional violation. First, the prisoner must have been "incarcerated under conditions posing a substantial risk of serious harm." *Id*. at 834. Second, the prison official must have shown "deliberate indifference" to the prisoner's safety. *Id*. Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

11

*Hines v. Lacy*, 189 F.3d 460, 1999 WL 642915 at *3 (2d Cir. 1999) (unpublished).

Plaintiff maintains that Stickel "intentionally did not make a minimal effort from the C.O's desk to prevent the assault" by Peguero. (Plaintiff's Affidavit, Docket [#49] at ¶ 5). Plaintiff further states that while he and Peguero were arguing, he "turn[ed] his face around and look[ed] toward the C.O.'s desk direction, [and made] eye contact directly with [Stickel]. Therefore, at this particular time, the inmate G. Peguero sw[u]ng the mop's handle [at] Plaintiff, hitting him on the chest and on the right side of his face." *Id*. at ¶ 6. The Court finds that Plaintiff has not demonstrated a triable issue of fact as to either prong of a failure-to-protect claim. *See, Hines v. Lacy*, 1999 WL 642915 at *3 ("Hines's complaint does not satisfy either prong of the *Farmer* test, because Hines's sketchy description of a verbal confrontation does not sufficiently allege "conditions posing a substantial risk of serious harm" or that the employees, with knowledge of the need to intervene, had time to do so before plaintiff was assaulted.") (internal quotation marks omitted).

First, Plaintiff has not shown that he was confined under conditions that posed a substantial risk of serious harm to him. Instead, it is undisputed that Plaintiff never had any disputes with Peguero prior to their argument. Moreover, following the assault, Plaintiff stated that he did not need protection from Peguero. Additionally, Plaintiff suffered only minor injuries. Second, there is no indication that Stickel was deliberately indifferent to Plaintiff's safety. Plaintiff maintains that Stickel had the opportunity to intervene, but waited until after Peguero struck Plaintiff with the mop handle. However, in addition to being speculative and conclusory, such statements are contradicted by Plaintiff's own prior testimony at his disciplinary hearings, wherein he stated that Stickel

12

immediately intervened when the dispute turned physical. Plaintiff does not claim that he called Stickel for assistance, even though he knew that Stickel was nearby. Instead, Plaintiff states only that he raised his voice while arguing with Peguero, hoping that Stickel might overhear the argument and intervene. Plaintiff has not raised a triable issue of fact as to whether Stickel was aware that Plaintiff was in danger of being assaulted by Peguero. Accordingly, Stickel is entitled to summary judgment on the failure-to-protect claim.

### *Issuance of False Misbehavior Report*

Stickel and Simon contend that they are entitled to summary judgment on Plaintiff's claims that they issued and/or approved a false misbehavior report against him. The Second Circuit has made clear that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997) (citations omitted). Here, there is no allegation that the false misbehavior report was in retaliation for Plaintiff's exercise of a constitutional right. Instead, Plaintiff alleges that Stickel wrote the misbehavior report to cover up his own neglect in failing to protect Plaintiff from Peguero, and that Simon conspired with Stickel, and approved the misbehavior report, even though it lacked sufficient allegations against Plaintiff. Such contentions fail to establish a constitutional violation. Accordingly, Stickel and Simon are entitled to summary judgment on Plaintiff's false misbehavior report claim.

### *Deliberate Indifference to Medical Needs*

Agustin contends that he is entitled to summary judgment on Plaintiff's medical

13

deliberate indifference claim. In response, Plaintiff maintains that Agustin should have sutured the cut on Plaintiff's face and obtained x-rays of Plaintiff's head and chest. The legal standard for such a claim is clear:

> In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious medical needs. This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind.
>
> Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation. [T]he Supreme Court [has] explained that the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat a prisoner's serious illness or injury resulting in the infliction of unnecessary pain and suffering. Because society does not expect that prisoners will have unqualified access to health care, a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care. Similarly, a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability. An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of 'recklessness' as used in criminal law.

*Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir.2003) (citations and internal quotations omitted). Courts have repeatedly held that disagreements over treatment do not rise to the level of a Constitutional violation. *See, Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998)("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Similarly, negligence constituting medical malpractice, without more, will not establish a constitutional claim. *Id*. (citation omitted).

14

Here, the Court finds at the outset that Plaintiff's injuries, consisting of a small cut on his face and a scratch on his chest, were not sufficiently serious to support an Eighth Amendment claim. Even assuming that such injuries were sufficiently serious, Plaintiff has also failed to show that Agustin acted with deliberate indifference. The record indicates that Agustin provided treatment and pain medication. Although Plaintiff believes that Agustin should have done more, Plaintiff provides no medial evidence to support his belief. Specifically, Plaintiff provides no evidentiary proof in admissible form to support his contention that he required stitches or x-rays. Plaintiff's claim against Agustin is a mere disagreement over treatment, and Agustin is therefore entitled to summary judgment.

*Procedural Due Process at Disciplinary Hearings*

Flagler and Saj maintain that they are entitled to summary judgment on Plaintiff's procedural due process claims arising from his disciplinary hearings. A prisoner has "a due process right to a hearing before he may be deprived of a liberty interest on the basis of a misbehavior report." *Boddie v. Schneider*, 105 F.3d at 862 (citation omitted). In regard to an inmate's claim that such due process rights were violated, the legal principles are well-settled:

> A prisoner asserting that he was denied due process in connection with prison disciplinary hearings that resulted in segregative confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). "After *Sandin*, in order to determine whether a prisoner has a liberty interest in avoiding disciplinary confinement, a court must examine the specific circumstances of the punishment." *Brooks v. DiFasi*, 112 F.3d 46, 49 (2d Cir.1997).

The circumstances that the court must examine include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions[ ] and ... the duration of the disciplinary segregation imposed compared to discretionary confinement." *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir.1998).

***

"[T]he duration and the frequency of such deprivations are highly relevant to whether the conditions of a plaintiff's confinement should be considered atypical." *Welch v. Bartlett*, 196 F.3d at 393; *see, e.g., Brooks v. DiFasi*, 112 F.3d at 47. Although we have not established a bright-line rule as to how lengthy a SHU confinement will be considered atypical and significant, *see, e.g., Colon v. Howard*, 215 F.3d at 234, we have characterized segregative sentences of 125-288 days as "relatively long," and thus necessitating "specific articulation of ... factual findings" before the district court could properly term the confinement atypical or insignificant, *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir.1998) (describing the segregative confinements at issue in *Miller v. Selsky*, 111 F.3d 7 (2d Cir.1997) (125 days)); *Brooks v. DiFasi*, 112 F.3d 46 (180 days); and *Wright v. Coughlin*, 132 F.3d 133 (168 days in SHU, followed by 120 days in keeplock). In *Colon* we ruled that a prisoner's SHU confinement for 305 days at the Clinton Correctional Facility was " 'atypical' and a 'severe hardship' within the meaning of *Sandin*." 215 F.3d at 229. We also noted that "[t]he longest confinement in normal SHU conditions that we have ruled was not shown to meet the *Sandin* standard was 101 days," id. at 231 (emphasis added) (discussing *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir.1999)), and we suggested that even that length might qualify as atypical and severe, *see Colon v. Howard*, 215 F.3d at 232 n. 5 ("We do not exclude the possibility that SHU confinement of less than 101 days could be shown on a record more fully developed than the one in *Sealey* to constitute an atypical and severe hardship under Sandin."). We instructed the district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days." Colon v. Howard, 215 F.3d at 232 (footnote omitted).

*Sims v. Artuz*, 230 F.3d 14, 22-23 (2d Cir. 2000).

In the instant case, in connection with the March 15, 2005, disciplinary hearing, Plaintiff served, at most, a total of eighteen days in SHU for which he did not receive

16

credit toward his March 25th sentence.⁶ As discussed earlier, it appears that those eighteen days are properly treated as pre-hearing administrative segregation. However, even considering the entire period between March 7, 2005 and June 3, 2005, when Plaintiff's conviction was reversed, the Court finds no protected liberty interest. In that regard, Plaintiff has not provided any information regarding the conditions in SHU during that period that would cause the Court to find that such confinement was particularly significant or atypical. Consequently, in connection with his procedural due process claim against Flagler, Plaintiff has failed to demonstrate that he had a protected liberty interest. Moreover, even assuming that he had such a liberty interest, it is clear from the Court's review of the hearing transcript that Flagler did not violate Plaintiff's due process rights. On this point, although Flagler refused to ask certain questions posed by Plaintiff, it was because the questions were irrelevant or otherwise improper. Moreover, Plaintiff has provided no evidence that Flagler was biased. Flagler is therefore entitled to summary judgment.

As for the claim against Saj arising from the March 25, 2005 hearing, Plaintiff served over four months in SHU, and the Court accordingly finds that he had a protected liberty interest. However, Plaintiff has failed to raise any triable issue of fact as to whether Saj violated his procedural due process rights. As to this issue, Saj gave Plaintiff a full and fair opportunity to call witnesses and present evidence. Accordingly, although Plaintiff contends that Saj should have believed Plaintiff's version of events,

---

⁶*See, Leevon v. Goord*, No. 99-CV-6208, 2003 WL 22384787 at *6, n. 5 (W.D.N.Y. Sep. 4, 2003) ("Where the length of confinement imposed is different from the time actually served, the duration of the confinement actually served is the appropriate time period to be analyzed for purposes of determining whether plaintiff had a liberty interest that triggered due process protections.") (*citing Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000)).

and found him not guilty[7], such argument fails to establish a constitutional violation. Therefore, Saj is entitled to summary judgment.

### Calculation of Plaintiff's SHU Sentence

Lastly, Eagen, Amoia, and Zimpfer contend that they are entitled to summary judgment on Plaintiff's claim arising from the calculation of his SHU sentence. As discussed above, Plaintiff alleges that Defendants failed to credit him for time-served, after the March 15, 2005 conviction was reversed. However, such allegation fails to state a constitutional violation, inasmuch as DOCS was entitled to treat the period between March 7, 2005 and March 25, 2005 as pre-hearing administrative confinement, for which Plaintiff would not receive credit toward his disciplinary sentence. *See*, *Davis v. Buffardi*, No. 0:01CV0285(GLS/GJD), 2005 WL 1174088 at *4 (N.D.N.Y. May 4, 2005) (Finding that the inmate-plaintiffs' "complaint that they were not credited for their pre-hearing confinement does not constitute a constitutional violation.") (citing 7 NYCRR § § 251-5.1(a)&(b) and 253.7(a) and *Nowlin v. Selsky*, File No. 97-CV-2716, 1992 WL 196782 at *3 (S.D.N.Y. Aug.5, 1992)). Moreover, even assuming that Plaintiff could demonstrate that his constitutional rights were somehow violated, he cannot demonstrate that the denial of his inmate grievance violated his constitutional rights[8], or that Eagen was personally involved in the denial of his grievance. Accordingly, Eagen, Amoia, and Zimpfer are entitled to summary judgment.

---

[7]*See*, Plaintiff's Affidavit in Opposition to Saj's Summary Judgment Motion [#49] at 9.

[8]The record indicates that the Disciplinary Review Committee, and not the Inmate Grievance Program, was the proper administrative body to address Plaintiff's complaint regarding calculation of his SHU sentence.

CONCLUSION

Defendants' summary judgment motion (Docket No. [#38]) is granted and this action is dismissed. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

    SO ORDERED.

Dated:    June 12, 2009
           Rochester, New York

                                    ENTER.

                                      /s/ Charles J. Siragusa
                                      CHARLES J. SIRAGUSA
                                      United States District Judge